IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MARIA A. BELTRAN,

            Plaintiff,                   No. CIV S-08-1754 EFB

      vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

            Defendant.                ORDER

_____/

      Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Income Benefits ("DIB") under Title II of the Social Security Act ("Act"). For the reasons discussed below, the court grants plaintiff's motion for summary judgment and/or remand, denies the Commissioner's cross-motion for summary judgment, and remands this case for further consideration.

////

////

////

////

////

1

I. BACKGROUND

Plaintiff, born October 2, 1960, applied for Social Security disability benefits on July 23, 2002, alleging disability since August 26, 1996. Administrative Record ("AR") 7.[1]  Her application was denied initially and on reconsideration. On July 26, 2004, after a hearing, Administrative Law Judge ("ALJ") William C. Thompson, Jr., issued an unfavorable decision. AR 605-615. On February 24, 2006, the Appeals Council granted plaintiff's request for review due to an incomplete record (the claim file was lost),[2] and remanded the case to the ALJ to obtain all available medical evidence, provide plaintiff the opportunity for a new hearing, and "give further consideration to the issue of disability for the entire period under review," AR 617, specifically, February 24, 1999 through plaintiff's last date insured, December 31, 2002. AR 605, 614, 901; *see also,* Def.'s Mem. at 2.

---

[1]  Plaintiff filed a prior Title II application in March 1997, AR 70-72, which was denied after hearing on February 23, 1999, AR 584-601. That decision is administratively final, AR 605, which plaintiff concedes, Pl.'s Mem. at 5, n. 1.

[2]  The court acknowledges significant gaps of information in the record. *See, e.g.*, AR 5, 7, 9, 10 (listing missing documents). The ALJ explained, "[a]lthough this office has attempted to reconstruct the claimant's file, many of the medical and other records previously exhibited remain lost. I was, however, able to obtain the claimant's treatment records." AR 32. Defendant acknowledges only that the missing evidence includes a relevant report of a consultative orthopaedic examiner dated November 2002 that found no vocationally relevant limitations. Def.' Mem. at 7, n. 5. Plaintiff's description of the missing evidence is more precise:

> Social Security lost the file on the application Ms. Beltran filed in 2002 and which is the basis of this appeal. Her file was "reconstructed," however, much of it is still missing. The missing documents include all the payment and jurisdictional documents (TR 5), the non-disability development, the disability related development documents (TR 7), the hearing transcript, and many of the medical records covering the period in question. TR 9-10. The missing records include daily activities questionnaires completed by Ms. Beltran and an unnamed third party source prior to her date last insured. The missing medical records include 43 pages of medical records from Joseph Bernstein, M.D. covering the period 11/5/98-11/23/99; 69 pages of medical records from B. Ravi Nayak, M.D. covering the period 8/21/96-5/01/00; as well as two Assessments received after the hearing. TR 9-10. The "List of Exhibits" indicates that these records were "not available for inclusion." Id.

Pl.'s Mem. at 2, n. 2.

A new administrative hearing was held on September 5, 2006.  AR 877-901.  Plaintiff testified that she was born on September 22, 1951, and was 54 years of age.  AR 881.  She stated that she completed her sophomore year in high school and obtained her GED in April 1977 or 1978.  Plaintiff stated that she can read and write.  AR 881-882.  She is married and she and her husband have six children (four born to plaintiff).   Plaintiff testified that she is 5'1" tall, weighs 160 pounds, and is right-handed.  AR 882.

Plaintiff testified that she last worked in August 1996, as a bilingual (English-Spanish) eligibility technician for Alameda County, where she was employed for 22 ½ years.  Plaintiff described this job as "get[ting] benefits for my clients," including Medi-Cal and food stamps, translating documents and assisting in the completion of applications.  AR 882-883.  Plaintiff last performed this job for a 2 ½-year period, from "'95 to when they retired me in '97."  AR 883.  Plaintiff worked full-time, 9.34 hours four days a week.  She was required to sit for the majority of this job, about three-quarters of the day, with some standing and walking.  She was also required to lift files and papers, weighing about three to ten pounds.  AR 884-885.  Other positions plaintiff held with Alameda County included medical receptionist, medical clerk, and medical records processor.  AR 885-886.

Plaintiff testified that she receives permanent disability benefits from her employment with Alameda County.  AR 882.  Review of the administrative transcript reveals that plaintiff sustained work-related injuries to her right wrist in 1988 and 1989, a lower back injury in November 1994, and developed additional pain symptoms in her left hip in 1995.  AR 730.  Plaintiff testified that she has a "fusion" in her neck that pinches nerves and "affects" her  upper extremities, especially her right arm; tennis elbow with pain that radiates down her right hand; right hand pain and burning; a "burning" impingement in her shoulder (rotator cuff); and back pain caused by the fusion of discs in her lower back, resulting in back spasms and pain radiating from her hip to her thigh.  AR 888-889, 892, 894.  Plaintiff testified that she has had back pain since 1986, when she was injured at work.  AR 895.  She has what are believed to be

1   congenitally-fused discs in her lumbar back and neck.  AR 890.  Plaintiff testified that her hands

2   become so sore that she is unable to grip a pen; that she has difficulty typing on a keyboard

3   because her fingers become numb; and that the difficulties with her right hand have become so

4   significant that she relies on her left hand.  AR 897, 901.

5        Plaintiff further testified that she has been blind ("light perception with no clarity") in her

6   left eye since birth (she had a corneal transplant at age 12 that failed to correct the condition),

7   and was diagnosed in 1995-1996 with glaucoma in her right eye.  AR 887-888.  Plaintiff has

8   blurred vision in her right eye, which sometimes worsens with medication.  AR 887.  She has

9   chronic dryness in both eyes.  AR 888.  Plaintiff also testified that she has a lot of ear pain, had

10  ruptured eardrums a couple of times, and is prescribed ear drops.  AR 899, 900.

11       Plaintiff testified that she first sought occupational medical treatment for her back

12  problems from Kaiser physician Dr. Kwan [phonetically spelled].  AR 895.  Plaintiff testified

13  that her current primary care physician was Dr. Mu, whom she sees when she is unable to

14  control her pain level, from a couple of times a month to once every three to six months.  AR

15  889.  Plaintiff stated that she hadn't seen her rheumatologist for about a year because Dr. Mu

16  was addressing her medical needs.  AR 890.  Dr. Mu has prescribed Vicodin, Relfen, and

17  Flexeril, and administered shots to plaintiff's shoulder, wrists, thumb and right knee.  AR 895.

18  Other treatment that plaintiff relies on includes physical therapy, home exercises, rest, heating

19  pads, warm water, ice pads, changing positions, paraffin baths for her hands, wrist braces for

20  both wrists, and a neck brace.  AR 889, 893, 895.  Plaintiff testified that her medications cause

21  dizziness and vertigo six or more times a day depending on her movements, and can also cause

22  nausea.  AR 899, 900.

23        Plaintiff testified that she attempted to go back to school full-time in 2001, but had to

24  withdraw due to depression; this condition has worsened.  AR 882, 883.  Plaintiff testified that

25  she was taking Prozac to treat her depression, at the direction of a psychiatrist and Dr. Mu.  AR

26  891.  Plaintiff stated that she became depressed after her older sister died in 1999 ("she was like

my mom"), then her 20-month granddaughter drowned in plaintiff's swimming pool in 2001. AR 891-892.  Her depressive symptoms include withdrawal from people, having less energy, not wanting to do anything, more difficulty concentrating.  AR 892, 898, 899.  Plaintiff also testified that she doesn't "sleep very well because I constantly have to be moving. I can't like lay too long on my left side, I can't lay too long on my right side.  I use pillows to try and help with that.  So my sleep, I don't have restful sleep."  AR 898, 899.

Plaintiff testified that she does only "a little bit" of housework.  AR 892.  She explained that her 19-year-old daughter does the vacuuming and dusting "because I'm having a lot of problems with my right arm."  *Id.*  Plaintiff testified that she occasionally cooks but her husband does most of the cooking because plaintiff has difficulty grasping utensils, seeing and sensing temperatures.  AR 893.  Plaintiff testified that she doesn't grocery shop unless it's an emergency.  She explained that driving was difficult because "[t]he problems with my vision, my range of motion because of my neck and back problems, and my hands, and my arms when I drive, it aggravates the symptoms more, so I try not to do anything that aggravates me to the point of uncontrollable pain."  AR 897; *see also* AR 893 (driving increases the pain in plaintiff's back, left hip, leg and right knee).

Plaintiff estimated that she is able to walk about one-quarter of a block, stand for 5 to 10 minutes at a time, and sit for 15 to 30 minutes before she has to change positions.  She testified that her ability to sit is limited by spasms in her lower back and a burning pain in her hip that radiates down her thigh.  AR 894.

A vocational expert ("VE") testified only minimally at the hearing, stating that plaintiff's past relevant work as an eligibility technician was sedentary, skilled work, while her past relevant work as a medical clerk was light, semi-skilled work.  AR 901.

////

////

////

On August 14, 2007, ALJ Thomson issued a decision finding that plaintiff is not disabled.[3]  AR 24-33.  The ALJ made the following formal findings:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2002.

2.    The claimant did not engage in substantial gainful activity during the period at issue:   February 24, 1999 through her date last insured of December 31, 2002 (20 C.F.R. 414.1520(b) and 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments:  a cervical impairment with radiculopathy and a loss of vision in one eye (20 C.F.R. 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).

---

[3]  Disability Insurance Benefits ("DIB") are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 *et seq.*  Supplemental Security Income ("SSI") is paid to disabled persons with low income.  42 U.S.C. §§ 1382 *et seq.*  Under both provisions, disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A five-step sequential evaluation governs eligibility for benefits. See 20 C.F.R. §§ 423(d)(1)(a), 416.920 & 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The following summarizes the sequential evaluation:

Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater,* 81 F.3d 821, 828, n. 5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  *Bowen*, 482 U.S. at 146, n. 5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  *Id.*

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant has the residual functional capacity to perform light work that only requires monocular vision.

6. Through the date last insured, the claimant's past relevant work as an eligibility technician and as a medical clerk did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 404.1565).

7. The claimant was not under a disability as defined in the Social Security Act, at any time from February 24, 1999 through December 31, 2002, the date last insured (20 C.F.R. 404.1520(f)).

AR 29-33.

On May 30, 2008, after receiving additional evidence from plaintiff, the Appeals Council denied plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner.  AR 13-16, 17.

II.  ISSUES PRESENTED

Plaintiff contends that the ALJ erred by:  (1) rejecting the opinion of plaintiff's treating physician, Dr. Mu, regarding plaintiff's residual functional capacity; (2) discrediting plaintiff's testimony regarding her pain and functional limitations; (3) failing to include all of plaintiff's supported limitations in his residual functional capacity assessment; and (4) failing to pose any hypothetical question to the vocational expert.

III.  LEGAL STANDARDS

Plaintiff does not contest the res judicata effect of the Commissioner's prior decision that plaintiff was not disabled on or before February 23, 1999.  Absent a showing of changed circumstances, the prior decision "creates a presumption that the claimant continued to be able to work after that date."  *Lester v. Chater*, 81 F.3d 821, 827 (9th Cir.1996) (quoting *Miller v. Heckler*, 770 F.2d 845, 848 (9th Cir.1985) (internal brackets omitted)); *Chavez v. Bowen*, 844 F.2d 691, 692-93 (9th Cir. 1988).  Thus, the medical evidence pertinent to the period before February 24, 1999, while relevant as background, cannot itself support a finding that plaintiff was disabled during the relevant period.  *Chavez*, 844 F.2d at 693, 694.

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

IV. MEDICAL EVIDENCE

The administrative transcript in this case exceeds 900 pages even though the medical evidence is incomplete. *See supra*, n. 2. Thus, while the following medical evidence is taken predominantly from the period February 24, 1999 to December 31, 2002, relevant evidence outside this period is summarized to provide a complete perspective.

A. TREATMENT HISTORY

1. Physical Health Treatment Records

The following information is taken from plaintiff's treatment records at Kaiser Permanente in Manteca for the relevant period February 1999 through December 2002. AR 781-840.

On August 30, 1999, a single field analysis of plaintiff's right eye was within normal limits, while her left eye was "borderline."  AR 839-840.

On August 31, 1999, plaintiff complained that her feet hurt when first standing in the mornings; she was diagnosed with plantar fasciatus and prescribed, *inter alia*, Tylenol #3 and hot soaks.  AR 836.

On September 8, 1999, plaintiff, designated a "glaucoma transfer pt. [from] Fremont [Kaiser]," was seen by ophthalmologist J. Adubofour, M.D.  AR 835.  Plaintiff complained of blurry vision and pressure, stated that she had had a corneal scar since six months of age, and had experienced 3 to 4 episodes of herpetic keratitis since her corneal transplant at age 12.  AR 835, 838.  The ophthalmologist requested prior records and scheduled a follow up in six months.

On September 22, 1999, plaintiff complained of prolonged chest pain and pressure.  A treadmill stress test was recommended, and plaintiff was advised to take Mylanta.  AR 837.  A stress echocardiograph performed January 6, 2000 yielded normal results.  AR 831-833

On December 1, 1999, plaintiff complained of left breast pain consistent with an August 1999 ultrasound showing the presence of cysts.  Plaintiff was advised to avoid caffeine, take Vitamin E, and restart Evista (raloxifene, to treat osteoporosis).  AR 834.

On January 12, 2000, plaintiff complained to Dr. Adubofour of intermittent right eye blurred vision.  AR 830.  Dr. Adubofour prescribed medications, suggested that plaintiff's left eye, which was grafted, may be amblyopic ("lazy eye").  Plaintiff was told to follow up in four months.

On February 10, 2000, plaintiff saw Dr. E. Raymond Mu, M.D., to obtain the results of her echocardiograph.  She complained of chest pain, muscle aches and feeling fatigued.  Dr. Mu questioned whether plaintiff might have chronic fatigue syndrome or fibromyalgia and prescribed the antidepressant Elavil.  AR 828-829.

On May 4, 2000, plaintiff complained to her ophthalmologist of blurred and double vision in her right eye  AR 826-827.  Dr. Adubofour suspected glaucoma and a failed graft in

plaintiff's left eye.  He ordered a refraction and a follow up in six months.  The refraction performed on May 8, 2000 revealed that the vision in plaintiff's right eye was 20/25, in her left eye 20/400.  AR 827.

On September 21, 2000, plaintiff complained of chest pain, dizziness, and sleep problems.  AR 825.  On October 2, 2000, plaintiff again saw Dr. Mu, who noted that plaintiff's chest pain had resolved.  AR 822.  Plaintiff complained of being tired, unable to sleep, dizziness, vertigo, and coughing.  Dr. Mu diagnosed earache, bronchitis, dizziness and insomnia, prescribed medications including Elavil, and questioned whether plaintiff may be experiencing panic attacks.  AR 823, 822.  On December 21, 2000, Dr. Mu noted that plaintiff's earache had resolved; he discontinued Celebrex for plaintiff's musculoskeletal pain and started Relafen.  AR 819.

On November 3, 2000, plaintiff complained to her ophthalmologist of double vision when reading.  AR 821. The ophthalmologist indicated that this was probably a blur from her amblyopic left eye.  Id.

On March 20, 2001, plaintiff complained to Dr. Mu of increasing hip pain.  AR 817.  Dr. Mu noted that plaintiff had a history of chronic back pain; he observed tenderness in plaintiff's left gluteal region and prescribed physical therapy, a home exercise program, and an x-ray of plaintiff's back.  AR 818; 813-815 (April 1, 2001 physical therapy records).

Plaintiff next saw Dr. Mu on November 27, 2001, stating that she had a history of degenerative disc disease in her back, tendonitis and bursitis in her shoulders and hands, and was experiencing increased pain in her hip, back, neck shoulders, hands.  AR 811.  Dr. Mu observed that plaintiff had tender spots in her neck, shoulders and upper extremities.  AR 811-812.  Plaintiff told Dr. Mu that she had not taken her Relafen since "last month;" he recommended that she restart the Relafen and also prescribed Flexeril.  AR 811, 812.

On February 11, 2002, plaintiff complained of right shoulder pain for a period of eight years.  AR 808. Dr. Mu's examination revealed mild paraspinal muscle tenderness along

plaintiff's spine, no tenderness but reduced range of motion of plaintiff's right shoulder, and reduced sensations in plaintiff's right hand.  AR 809.  Dr. Mu ordered an x-ray of plaintiff's shoulder, referred her to the rheumotology department, and noted that if her symptoms persisted he would order a nerve conduction study relative to right radiculopathy.  AR 809.  Plaintiff had physical therapy for her right shoulder on March 6, 2002.  AR 804-805.

On March 12, 2002, Dr. Gage, a neurologist, noted plaintiff's referral for "symptoms of pain/numbness of both hands beginning on right then left which did not respond to treatment with bracing/splinting . . . ."  Dr. Gage further noted plaintiff's complaints of increasing shoulder pain, right greater than left, and weakness in her right shoulder.  AR 799, 797.  Upon examination, Dr. Gage noted reduced tone and ordered a cervical MRI.  *Id*.  On March 26, 2002, plaintiff reported that her shoulder was feeling better with reduced overhead activities and bracing at night.  AR 801.  On April 1, 2002, Dr. Gage noted that plaintiff had fewer subjective complaints unless reaching overhead.  *Id*.

On June 13, 2002, Dr. Gage diagnosed right ulnar neuropathy of the right elbow, no evidence of a primary muscle disorder to explain plaintiff's cramping sensations, no confirmed radiculopathy, and superficial neuralgia-type symptoms in her right arm for which Dr. Gage prescribed a trial of Neurontin.  AR 793. Dr. Gage instructed plaintiff to return in three to four weeks.  *Id*.

On June 28, 2002, a refraction analysis indicated that plaintiff's vision in her right eye was 20/20, in her left eye 20/400.  AR 789.

In July 2002, plaintiff's physical therapist noted plaintiff's symptoms of constant left hip and thigh pain, and recommended use of a corset while performing household chores, application of ice, a TENS unit, and exercises.  AR 790-792.

On August 26, 2002, plaintiff complained of an earache lasting 6 weeks.  Dr. Barbara Bauer, M.D., prescribed amoxicillin.  AR 787.

////

11

On August 29, 2002, Dr. Gage diagnosed "mild right ulnar neuropathy."  AR 785.  On September 16, 2002, Dr. Hamilton diagnosed right ulnar neuropathy and lower back pain.  AR 786.

On September 20, 2002, orthopedist Dr. Charles Buckerfield, M.D., examined Plaintiff and made the following findings:

> ulnar 2 fingers can get numb, arms feel weak, crampy in AM, sensitive to cold. Retired from county with cumulative trauma back hip.  takes neurontin flexeril relafin pm. has glaucoma right eye.  Lft eye blind.  Relafin 500 mg just at night pm.  She has other problems.  Surgery for ulnar nerve decompression would not predictably help her.  I suggested a cortisone injection around flexor tendons but she  didn't want to do that.  She can RTC [return to clinic] prn [as needed].  Her sx [symptoms] are not supported by objective findings. [sic]

AR 784.

On December 12, 2002, plaintiff was treated for right ear pain and dizziness.  AR 782.

On December 16, 2002, Dr. Gage found upon examination of plaintiff reduced neck extension, with pain on right rotation, normal strength and reflexes, slow gait.  AR 781.  Dr. Gage diagnosed neck pain, mild right neck paresthesias, back pain, and fibromyaglia.  He recommended that plaintiff discontinue Flexeril, prescribed Robaxin, conditioning activities, and that plaintiff return in five months.  *Id.*

2.  Mental Health Treatment Records

Plaintiff previously obtained mental health treatment from Dr. Sandra Gomez, Ph.D., from approximately March through August 1998.  AR 562-579.  Dr. Gomez made the following initial diagnosis pursuant to the American Psychiatric Association's multiaxial framework:[4]

---

[4]  The American Psychiatric Association's Multiaxial Assessment is set forth in the Diagnostic and Statistical Manual of Psychiatric Disorders, ("DSM-IV") (4th Ed. 1994), at pp. 27-37:

| | |
|---|---|
| Axis I: | Clinical Disorders |
| | Other Conditions That May Be a Focus of Clinical Attention |
| Axis II: | Personality Disorders |
| | Mental Retardation |

|        |       |                                                                  |
|--------|-------|------------------------------------------------------------------|
| Axis I:   | 309.0 [Adjustment disorder with depressed mood] (Rule Out 296.32 [Major depressive affective disorder recurrent episode moderate degree]) |
| Axis II:  | 799.9 [diagnosis deferred] |
| Axis III: | Multiple physical problems |
| Axis IV:  | 40 [not explained] |
| Axis V:   | 60[5] |

AR 575.

In her most recent comprehensive assessment, Dr. Gomez found, on May 31, 1998, that plaintiff had severe depression, moderately severe impairments of memory and sleep, mild anxiety, and that her judgment was severely impaired. AR 579. Dr. Gomez made the following multiaxial assessment:

|        |       |
|--------|-------|
| Axis I:   | Primary: 296.25 [Major depressive affective disorder single episode in partial or unspecified remission] |
| Axis II:  | 799.90 [diagnosis deferred] |
| Axis III: | Multiple problems |
| Axis IV:  | OCP [occupational] |
| Axis V:   | Current 50.[6] Highest in last 12 months: 65.[7] |

*Id.*

////

---

|        |       |
|--------|-------|
| Axis III: | Medical Conditions |
| Axis IV:  | Psychosocial and Environmental Problems |
| Axis V:   | Global Assessment of Functioning ("GAF"). |

The Global Assessment of Functioning ("GAF") scale accords an assessment of a patient's "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *Id.*, at 32.

[5] A GAF 60 (51 to 60) denotes "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." DSM-IV at 34.

[6] A GAF 50 (41 to 50) denotes "Severe symptoms ( e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting ) OR any serious impairment in social, occupational or school functioning ( e,g., no friends, unable to keep a job ). DSM-IV, at 34.

[7] A GAF 65 (61 to 70) denotes "Some mild symptoms ( e.g., depressed mood and mild insomnia ) OR some difficulty in social occupational, or school functioning ( e.g., occasional truancy or theft within the household ), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV, at 34.

Within the relevant period, on March 4, 1999, plaintiff obtained a "Mental Health Initial Assessment" by Dr. Richard Slawsskey, M.D. AR 556-561. Dr. Slawsskey noted plaintiff's symptoms of disturbed sleeping and eating, distraction, decreased concentration and coping skills, increased irritability and fatigue, marital conflicts, and having thoughts of suicide. Dr. Slawsskey diagnosed major depression:

| | |
|---|---|
| Axis I: | Major depression, 256.22 |
| Axis II: | V-71.09 [no diagnosis] |
| Axis III: | Chronic pain |
| Axis IV: | Moderate severity of psychological stressors |
| Axis V: | GAF Current 60; Best: 90[8] |

AR 559.

Dr. Slawssky indicated that Ms. Beltran's illness was at an early stage and moderately severe; he recommended outpatient therapy. AR 559, 560.

An April 13, 1999 treatment record by Dr. Slawsskey (AR 553-555) reflected that plaintiff had moderately severe problems with her relationships/family; moderate depression of moderate duration (one-to-six months); had moderately impaired memory; mild to moderate somatization and sleep disturbance; and mild anxiety. AR 554. The report reflected that Ms. Beltran had taken Prozac seven years before, for a period of four months. AR 555. She had been taking Wellbutrin for the last week, with side effects of increased pulse. *Id.* Dr. Slawsskey made the following diagnosis:

| | |
|---|---|
| Axis I: | Primary: 296.22 [Major depressive disorder, single episode, moderate] |
| | Secondary: V71.09 [no diagnosis] |
| Axis II: | Omitted |
| Axis III: | Chronic pain |
| Axis IV: | Primary support, other (chronic pain) |

////

[8] A GAF 90 (81-90) denotes "Absent or minimal symptoms ( e.g., mild anxiety before an exam ), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)." DSM- IV, at p. 34.

1      Axis V:      Current GAF is 60; highest in last 12 months is 80.[9]

2              3.  <u>Report of Plaintiff's Treating Physician, Dr. E. Raymond Mu, M.D.</u>

3      On August 22, 2006 (nearly four years after plaintiff's last date insured), Dr. Mu

4 completed a "Complete Medical Report (Physical)" and "Medical Assessment of Ability to Do

5 Work-Related Activities (Physical)." AR 681-685. The Medical Report indicated that Dr. Mu

6 had treated Ms. Beltran since February 11, 2000, and made diagnoses of cervical radiculopathy,

7 amblyopia, and early glaucoma. He noted clinical findings of neck pain radiating to plaintiff's

8 arm due to radiculopathy, status/post cornea transplant, amblyopia and early glaucoma. He

9 noted treatment of these conditions with Relafen and Vicodin and followup through the

10 ophthalmology department. Dr. Mu opined that plaintiff's response to treatment had

11 demonstrated "no improvement but stable," and that her prognosis was "poor." AR 681.

12      In his Medical Assessment of Ability to Do Work-Related Activities (Physical), Dr. Mu

13 opined that plaintiff could frequently lift and carry no more than 10 pounds, that her ability to sit,

14 stand and walk were not impacted, but that she was restricted from working around heights or

15 moving machinery, and restricted from areas with dust, temperature extremes, fumes, or

16 vibrations. Dr. Mu opined that plaintiff could only occasionally climb, crouch, and crawl, that

17 she could frequently but not continuously use her right hand, that she could frequently push/pull,

18 and continuously reach, handle, feel, hear and speak, and that she required a ten-minute break

19 every hour. AR 682-685.

20      The remainder of plaintiff's treatment records, AR 733-780, dated January 6, 2003

21 through March 2007 and therefore after her date last insured (December 31, 2002) reflect

22 continuing visual symptoms associated with glaucoma and amblyopia, AR 767, 768, 774, 759,

23 755, 751; ongoing complaints of right shoulder and arm pain, neck/back/hip pain,

24

25     [9] A GAF 80 (71-80) denotes, "If symptoms are present, they are transient and expectable reactions to psychosocial stressors ( e.g., difficulty concentrating after family argument ); no more than slight impairment in social occupational, or school functioning ( e.g., temporarily

26 falling behind in schoolwork )." DSM-IV at 34.

cramping/spasms of hands and calves, right knee pain, AR 766; neck and upper extremity pain, AR 745; hand pain, AR 740; left leg pain, AR 738; thoracic pain, AR 756; chest pain, AR 749-750; ear pain, AR 757-758; headache and dizziness, AR 747-748; negative objective findings relative to plaintiff's right ulnar nerve, AR 765; normal chest x-rays, AR 746, 743; diagnosis of myofascial pain, AR 752; and diagnosis of depression by Dr. Mu, AR 760-761.

B.  CONSULTATIVE EXAMS (All Prior to Plaintiff's Last Date Insured)

On July 8, 1997, Dr. Robert Wagner, M.D., advised the General Manager of the Alameda County Employees' Retirement Association of plaintiff's work/injury history, specifically, that plaintiff had suffered a right wrist injury in 1988 while working as a Medical Records Clerk when several charts feel on her wrist; that a similar reinjury occurred in 1989; that in 1995 plaintiff transferred to the position of Eligibility Technician in an effort to put less stress on her upper extremities; that she experienced a work-related injury to her lower back in 1994 when she tripped over a dolly, experiencing pain radiating into her buttocks with foot numbness; that an MRI revealed degenerative disc disease of the lumbar spine with disc herniation; that in August 1996 it was determined that light duty work would no longer be available to accommodate plaintiff's restrictions; that in September 1996, electrodiagnostic studies revealed no carpal tunnel syndrome but plaintiff began to experience similar symptoms in her left upper extremity due to enhanced reliance on her nondominant arm and hand; that recent exams revealed multiple areas of tenderness and recent residual functional capacity analyses concluded that plaintiff could not return to even part-time clerical work.  AR 729-731.  Dr. Wagner recommended that plaintiff be offered service-connected disability retirement due to cumulative trauma disorder impacting multiple areas.  AR 731.

On September 10, 1997, Dr. Steven D. Feinberg, M.D., a pain specialist, examined plaintiff and opined that she had:  "(1) Cumulative trauma/over use syndrome by history, right greater than left.  (2) Chronic lumbar strain syndrome.  (3) Chronic pain syndrome."  AR 543-544.  Dr. Feinberg noted that plaintiff "has already undergone negative electrodiagnostic testing

1   . . . and her findings today are rather nonspecfic and not particularly objective in nature, which is

2   often the case with these disorders." AR 544. Dr. Feinberg opined that plaintiff would benefit

3   from participation in his clinic's Functional Restoration and Chronic Pain Program but "really

4   want her to be committed to a significant effort. . . ." *Id.*; *see generally,* AR 540-545.

5       On October 9, 1997, Dr. Steven W. Avon, M.D., an orthopedic specialist, reported that he

6   had examined plaintiff and concluded that she had "chronic lumbar sprain and chronic left

7   trochanteric bursitis." AR 550. While noting that plaintiff's condition was not yet permanent

8   and stationary, he opined that plaintiff may benefit from an epidural injection, perhaps a series of

9   three injections, and perhaps "a left trochanteric bursal injection." *Id.* Dr. Avon opined that

10  plaintiff would be able to return to her regular work activities as a patient services technician "if

11  she would be able to vary sitting and standing to control her low back symptomology." AR 550-

12  551. Dr. Avon concluded, "[t]he patient would be advised to sit for periods of 30 to 45 minutes

13  following which she would stand for periods of 15 minutes. The patient would be advised to

14  have a weight limit of five to ten pounds." AR 551; *see generally*, AR 546-552.

15      On July 24, 1998, Dr. B. Ravi Nayak, M.D., a specialist in Physical Medicine and

16  Rehabilitation, examined plaintiff and opined that she had "chronic cumulative trauma disorder,

17  upper extremities and neck," with "significant limitation of function and pain," and concluded

18  that she "still has significant limitation in her ability to write, use a keyboard and reach over the

19  shoulder." AR 523. Dr. Nayak opined that plaintiff "is unable to return to her customary and

20  usual work as an eligibility technician." *Id.*; *see generally*, AR 521-523.

21  V.  DISCUSSION

22      As earlier noted, principles of res judicata make binding the prior ALJ's determination

23  relative to plaintiff's residual functional capacity for the period ending February 23, 1999.

24  *Chavez v. Bowen*, supra, 844 F.2d at 694. The prior ALJ found that plaintiff had severe physical

25  impairments of her right upper extremity (repetitive stress syndrome) and lumbar spine (chronic

26  lumbar strain syndrome), but that she did not have a severe mental impairment. At Step Four of

the sequential analysis, *see supra*, n. 3, the prior ALJ found that plaintiff retained the residual

functional capacity to perform work at the light and sedentary exertional levels, with sitting

limited to one hour continuously for a total of four hours per day, and that she was "precluded

from work requiring:  fingering, typing or writing for more than 15 to 20 minutes continuously

or per hour; more than occasional handling or fingering; forcible gripping or grasping; twisting

actions of the hands; kneeling; and more than occasional reaching above shoulder level."  AR

599.  Pursuant to the testimony of a vocational expert the prior ALJ concluded, at Step Five, that

plaintiff could perform her past relevant work as a medical translator/interpreter (a skilled,

sedentary job) but not her past work as, *inter alia*, a medical records clerk or eligibility

technician because these jobs required more than occasional fingering.  AR 599, 597.  The ALJ

also found, relying on the vocational expert's testimony, that plaintiff could perform other work

including surveillance systems monitor and investigator of dealer accounts.  AR 597-598.

Here the ALJ concluded, at Step Four of the sequential analysis, that despite having

severe impairments of "cervical impairment with radiculopathy and a loss of vision in one eye,"

plaintiff could perform her past work both as an eligibility technician and a medical clerk.  AR

30-33.  Although he found that plaintiff's subjective complaints "are not entirely credible" and

gave "little weight" to the 2006 report of Dr. Mu, the ALJ failed to make specific findings

relative to plaintiff's residual functional capacity, AR 32-33, concluding only generally as

follows:

> The claimant testified that she was able to successfully work for a number of
> years as an eligibility technician and as a medical clerk despite her monocular
> vision.  The vocational expert classified the job of eligibility technician as
> requiring sedentary exertion and the job of medical clerk as requiring light
> exertion.
>
> *In comparing the residual functional capacity the claimant had as of the date last
> insured with the physical and mental demands of this work, I find that the
> claimant was able to perform it as it was actually and generally performed.*

AR 33 (emphasis added).  In other words, the ALJ found, without providing his own residual

functional capacity assessment, that plaintiff's physical and mental condition had both remained

the same since February 1999 and so improved that she could now perform the very jobs

(medical records clerk and eligibility technician) that the prior ALJ excluded.  Thus, the ALJ

both adopted and rejected the prior ALJ's finding that plaintiff was "precluded from work

requiring:  fingering, typing or writing for more than 15 to 20 minutes continuously or per hour;

more than occasional handling or fingering; forcible gripping or grasping; twisting actions of the

hands."  AR 599.  The instant ALJ also implicitly found that plaintiff was limited to sitting one

hour continuously for a total of four hours per day and no more than occasional kneeling and

reaching above shoulder level.  *Id.*

Compounding this superficial analysis and inconsistent reliance on the residual functional

capacity assessment of the prior ALJ, the instant ALJ improperly discredited plaintiff's

subjective complaints and selectively relied on the report of Dr. Mu.

In discrediting plaintiff's subjective complaints, the ALJ found:

> After considering the evidence of record, I find that the claimant's medically
> determinable impairments could have been reasonably expected to produce some
> the alleged symptoms, but that the claimant's statements concerning the intensity,
> persistence and limiting effects of these symptoms are not entirely credible.  For
> example, *there is minimal treatment evidence that the claimant's symptoms
> existed to the degree alleged before her date last insured.*

AR 32 (emphasis added).  Although the ALJ provided valid examples of "short-term

complaints" for which plaintiff received minimal treatment (chest pain, ear pain, vertigo), he

noted without analysis plaintiff's ongoing complaints of impaired vision, hip pain, right shoulder

pain, numbness and tingling in her arm, hands and toes.  *Id.*  The ALJ also stated, incorrectly,

that "[d]epression is not mentioned in the treatment records until September 2003 (Exhibit B-21

F/29)."  *Id.*  Rather, plaintiff testified that she became depressed after her older sister died in

1999, then her granddaughter died in 2001, AR 891-892, both occurrences within the relevant

period.  Dr. Slawsskey diagnosed depression in March and April 1999, and prescribed outpatient

therapy and Wellbutrin.  AR 553-561.  Dr. Mu prescribed the antidepressant Elavil in 2000.  AR

828-829.  Thus, the evidence supports a finding that plaintiff had a severe mental impairment

1   during the relevant period, unlike the preceding period.

2        The ALJ's analysis also fails to specify which testimony of plaintiff he found credible

3   and that which he discredited.  In rejecting a claimant's subjective complaints, the administrative

4   law judge "must provide 'specific, cogent reasons for the disbelief.'  *Lester v. Chater*, 81 F.3d

5   821, 834 (9th Cir. 1995) (quoting *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990)).

6   Without affirmative evidence showing that the claimant is malingering, the Commissioner's

7   reasons for rejecting the claimant's testimony must be clear and convincing.  *See Lester*, 81 F.3d

8   at 834; *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989) . . . . If an ALJ finds that a

9   claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the

10  ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive.

11  *See Bunnell v. Sullivan*, 947 F.2d 341 (9th Cir. 1991).  The ALJ must specifically identify what

12  testimony is credible and what testimony undermines the claimant's complaints.  *See Lester*, 81

13  F.3d at 834; *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Varney v. Sec'y of Health and

14  Human Servs.*, 846 F.2d 581, 584 (9th Cir. 1988)."  *Morgan v. Apfel*, 169 F. 3d 595, 599 (9th

15  Cir. 1999).

16       Moreover, the ALJ's reliance on "minimal treatment evidence" to discredit plaintiff's

17  subjective complaints is inherently unpersuasive – the Commissioner's loss of plaintiff's claim

18  file should accord plaintiff, not the Commissioner, any benefit of the doubt.

19       Finally, the selective reliance on Dr. Mu's 2006 report was both inappropriate and

20  unsupported.  A contradicted opinion of a treating physician may be rejected only for "specific

21  and legitimate" reasons supported by substantial evidence.  *Lester v. Chater*, 81 F.3d at 830.

22  This test is met if the Commissioner sets out a detailed and thorough summary of the facts and

23  conflicting clinical evidence, states his interpretation of the evidence, and makes a finding.

24  *Magallanes v. Bowen*, 881 F.2d 747, 751-55 (9th Cir.1989).  However, absent specific and

25  legitimate reasons supported by substantial evidence, the Commissioner must defer to the

26  opinion of a treating or examining professional.  *Lester*, 81 F.3d at 830-31.

The ALJ selectively relied on Dr. Mu's report to conclude that plaintiff had no limitations of sitting, standing, walking, fingering or handling (contrary to the findings of the prior ALJ that plaintiff can sit one hour continuously for a total of four hours per day, and finger or handle only 15 to 20 minutes continuously or per hour), expressly rejected Dr. Mu's finding that plaintiff can only frequently (rather than continuously) use her right hand, and ignored without comment Dr. Mu's opinions that plaintiff required a ten minute break every hour and could lift and carry no more than 10 pounds on both a frequent and occasional basis.  These inconsistencies are underscored by the ALJ's factually unsupported findings, e.g., the ALJ's rejection of fingering limitations because the record provides "little, if any, mention of pain radiating to the claimant's arm or of a current impairment that would cause fine or gross manipulation restrictions during the period at issue." AR 33.  Rather, the relevant medical evidence contains ample evidence of plaintiff's complaints of pain in her right shoulder, elbow, arm, wrist, hand and fingers.  *See, e.g.*, AR 781, 784-786, 793, 797-799, 801, 804-805, 808-809, 811-812.

 "[T]he Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence.  Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and internal quotations omitted); *see also Holohan v. Massanari*, 246 F.3d 1195, 1203-05, 1207-1208 (9th Cir. 2001) (administrative law judge's selective reliance on physician records warranted reversal); *accord, Rollins v. Masanari*, 261 F.3d 853, 861 (9th Cir. 2001).

The ALJ's failure to articulate a clear and supported residual functional capacity assessment is fatal to his Step Four analysis.  "Although the burden of proof lies with the claimant at step four, the ALJ still has a duty to make the requisite factual findings to support his conclusion.  S.S.R. 82-62.  *See* 20 C.F.R. §§ 404.1571 and 416.971, 404.1574 and 416.974, 404.1565 and 416.965." *Pinto v. Massanari*, 249 F.3d 840, 844 (9th Cir. 2001).  "This is done

1   by looking at the 'residual functional capacity and the physical and mental demands' of the

2   claimant's past relevant work.  20 C.F.R. §§ 404.1520(e) and 416.920(e)."  *Pinto*, 249 F.3d at

3   844-45.  The claimant must be able to perform: (1) the actual functional demands and job duties

4   of a particular past relevant job; or (2) the functional demands and job duties of the occupation

5   as generally required by employers throughout the national economy.  *Id.* at 845 (citing S.S.R.

6   82-61).  "This requires specific findings as to the claimant's residual functional capacity, the

7   physical and mental demands of the past relevant work, and the relation of the residual

8   functional capacity to the past work."  *Id.* (citing S.S.R. 82-62).

9        The court concludes that the ALJ's failure specifically to assess plaintiff's residual

10  functional capacity and his inconsistent reliance on the residual functional capacity assessment

11  of the prior ALJ, in addition to specific unsupported findings, fatally undermine the ALJ's

12  conclusions that plaintiff was not disabled during the closed period February 24, 1999 through

13  December 31, 2002.  Accordingly, this action will be remanded for further consideration by the

14  Commissioner commencing with a detailed and supported determination of plaintiff's physical

15  and mental residual functional capacity.  In addition, the ALJ will obtain the oral or written

16  opinion of a vocational expert relative to plaintiff's ability to perform her prior work and other

17  work that exists in the national economy,[10] based upon the ALJ's residual functional capacity

18  assessment; plaintiff shall be accorded the opportunity to submit her own questions to the

19  vocational expert.

20  ////

21  ////

22

23       [10] "If a claimant does not have the residual functional capacity to perform past relevant
     work, then it is the Commissioner's burden at step five to establish that the claimant can perform

24   other work.   The ALJ may use a vocational expert . . . to determine whether a claimant can use
     his or her work skills in other work.   20 C.F.R. §§ 404.1566(e) &  416.966(e).   Hypothetical

25   questions asked of the vocational expert must set out all of the claimant's impairments.  If the
     record does not support the assumptions in the hypothetical, the vocational expert's opinion has

26   no evidentiary value."  *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001)(case citations and
     internal quotations omitted).

VI.  <u>CONCLUSION</u>

Accordingly, IT IS HEREBY ORDERED that:

1.  Plaintiff's motion for summary judgment and/or remand is granted.

2.  The Commissioner's cross-motion for summary judgment is denied.

3.  This case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings and findings consistent with this order.

4. The Clerk is directed to enter judgment for plaintiff.

SO ORDERED.

DATED:  March 31, 2010.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE